# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| TODD MACLAUGHLAN, individually and derivatively on behalf of Profounda, Inc., <br><br>        Plaintiff, <br><br>    v. <br><br> ILANA EINHEIBER, GREGORY ORLESKI, MORRIS GOODMAN, and JODDES LIMITED, <br><br>        Defendants, <br><br>   and <br><br> PROFOUNDA, INC., a Delaware corporation, <br><br>        Nominal Defendant. | ) ) ) ) ) ) ) ) C.A. No. 2024-1126-JTL ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

## OPINION REGARDING MOTION TO DISMISS

Date Submitted: November 17, 2025
Date Decided: February 26, 2026

Robert L. Burns, Kevin M. Gallagher, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Morgan J. Hanson, Lucy E. Hill, DENTONS COHEN & GRIGSBY P.C., Pittsburgh, Pennsylvania; *Attorneys for Plaintiff Todd MacLaughlan.*

Megan Ward Cascio, Cassandra L. Baddorf, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; *Attorneys for Defendants Ilana Einheiber, Gregory Orleski, Morris Goodman, Joddes Ltd., and Nominal Defendant Profounda, Inc.*

**LASTER, V.C.**

Plaintiff Todd MacLaughlan founded Profounda, Inc. (the "Company"). He obtained funding from an affiliate of defendant Morris Goodman.[1] The Company secured a profitable contract, and MacLaughlan contends that he was entitled personally to 30% of the profits. Morris, by contrast, contends that MacLaughlan disloyally diverted a corporate asset by taking a share of the profits. After Morris raised the diversion claim, he and a colleague left the board, and Morris filled the vacancies with individuals who serve as officers for two of his affiliates. The new directors are investigating the diversion claim.

MacLaughlan responded with this lawsuit. He contends that the diversion claim is so unfounded that the two directors are breaching their fiduciary duties by investigating it instead of dissolving the Company and winding up its affairs. MacLaughlan also contends that Morris breached his fiduciary duties by ignoring the Company's operations until he saw an opportunity to use the diversion claim to benefit himself. And MacLaughlan contends that Morris and the affiliate he used to fund the Company breached their fiduciary duties as controlling stockholders by electing the new directors to conduct a bad faith investigation. He further contends that Morris and his affiliate breached their fiduciary duties as controlling stockholders by preventing the Company's contractual counterparty from renewing

_____

[1] I usually refer to individuals by their last names without honorifics. Several members of the Goodman family play roles in this case. After their initial appearances, this decision refers to them using their first names, without implying familiarity or intending disrespect.

the profitable agreement. MacLaughlan asserts that the same conduct constitutes tortious interference with the Company's business relationships.

Morris's affiliate moved for dismissal under Rule 12(b)(2), contending that the court cannot exercise personal jurisdiction over it. The court lacks personal jurisdiction over the affiliate, because it has not engaged in any Delaware-directed act that could support jurisdiction under Delaware's long-arm statute. The affiliate is a controlling stockholder, but Delaware lacks a consent-to-jurisdiction statute for controllers, and there is no other way to reach the affiliate. As control mechanisms proliferate and become more granular,[2] the inability to exercise personal jurisdiction over the party pulling the strings could present a public policy issue, albeit a fixable one.[3]

---

[2] *See* 8 *Del. C.* § 122(18) (authorizing governance agreements that contain granular control mechanisms, including a provision "requir[ing] the approval or consent of 1 or more persons or bodies before the corporation may take actions specified in the contract (which persons or bodies may include the board of directors or 1 or more current or future directors, stockholders or beneficial owners of stock of the corporation)" or "covenant[ing] that the corporation or 1 or more persons or bodies will take, or refrain from taking, actions specified in the contract (which persons or bodies may include the board of directors or 1 or more current or future directors, stockholders or beneficial owners of stock of the corporation")"; *W. Palm Beach Firefighters' Pension Fund v. Moelis & Co.*, 311 A.3d 809, 825–27 (Del. Ch. 2024) (describing suite of granular control mechanisms that Section 122(18) expressly validated).

[3] The case for statutory consent-based jurisdiction over controlling stockholders seems at least as compelling as the case was in 2002 for officers. *See* William B. Chandler III & Leo E. Strine, Jr., *The New Federalism of the American Corporate Governance System: Preliminary Reflections of Two Residents of One Small State*, 152 U. Pa. L. Rev. 953, 1003–04 (2003) (advancing proposal for statutory consent-based jurisdiction over officers that appeared first in Robert B. Thompson & Hillary A. Sale, *Securities Fraud as Corporate Governance: Reflections Upon*

Unlike his affiliate, Morris consented to personal jurisdiction in Delaware for claims sufficiently related to his service as a director. Moreover, if the complaint asserts a viable claim against Morris in his capacity as a director, then the court can exercise ancillary jurisdiction over Morris for the claims against him in his non-director capacities, because all are sufficiently interrelated. But the complaint fails to state a viable claim against Morris in his capacity as a director, so the court lacks personal jurisdiction over him for the other claims.

The claims against Morris and his affiliate as controlling stockholders, conspirators, and tortious interferers are dismissed without prejudice.

---

*Federalism*, 56 Vand. L. Rev. 859, 906 (2002) ("For Delaware to expand its focus on officer conduct it would have to amend its jurisdictional statute to include officers rather than just directors.")). The case for statutory consent-based jurisdiction over controlling stockholders seems more compelling than the concept of *de facto* consent-based jurisdiction over aiders and abetters, as contemporaneously advocated in 2002. *See* Chandler & Strine, *supra*, at 1004 ("[S]ection 3114 could also be amended to clarify that any person who aids and abets a breach of fiduciary duty against a Delaware corporation is subject to jurisdiction in Delaware so long as Delaware's exercise of jurisdiction is consistent with federal constitutional standards of due process. . . . So long as the Delaware courts are satisfied that the fundamental fairness concerns of the federal due process test are satisfied, they should not have to trifle with the application of a long-arm statute designed for other purposes (namely, tort and contract cases)."). The case for statutory consent-based jurisdiction over controlling stockholders is particularly strong since the Safe Habor Amendment departed from historical practice by establishing a hard floor for non-majority control at one-third of the voting power. *Compare* 8 *Del. C.* § 144(e)(2) *with* J. Travis Laster, *How to Evaluate Majority Control: What History and Statutes Tell Us—Part One: The Historical Dominance of Functionalism,* 31 Fordham J. Corp. & Fin. Law 1 (2025). A person who acquires one-third or more of the voting power can implicitly consent to jurisdiction in the Delaware courts, just like a person who becomes a director or officer. *Cf.* 10 *Del. C.* § 3114(a) & (b).

3

Morris and the two current directors face claims for breach of fiduciary duty in their capacities as directors. They moved to dismiss those claims under Rule 12(b)(6) and, to the extent they are derivative, Rule 23.1. The Rule 23.1 analysis turns on whether the complaint states claims that present a substantial risk of liability, and that requires allegations that state a claim. It therefore makes sense to proceed under Rule 12(b)(6).

Under Rule 12(b)(6), the allegations against Morris and the two current directors fail to state claims on which relief can be granted. Either MacLaughlan cannot state a claim under the applicable standard of conduct, or his theories fail under the applicable standard of review. The conspiracy claim fails for want of a primary wrong.

One claim, however, survives. MacLaughlan seeks a declaratory judgment that he did not improperly divert a corporate asset. That claim is ripe and can move forward. The Company is both the lone remaining defendant and the proper defendant on this claim. MacLaughlan must file a second amended complaint that names the Company as a merits defendant, rather than a nominal defendant, so that the litigation can proceed.

4

# I.    FACTUAL BACKGROUND

The facts are drawn from the well-pled allegations of the amended complaint (the "Complaint") and the documents it incorporates by reference.[4] At this stage, the Complaint's allegations are assumed to be true, and the plaintiff receives the benefit of all reasonable inferences.

## A.    The Company And Genarest

MacLaughlan is an entrepreneur in the pharmaceutical industry. In 2013, he founded the Company to develop and secure approval from the U.S. Food and Drug Administration (the "FDA") for a drug named Genarest. The Company is a Delaware corporation with its principal place of business in Florida. MacLaughlan is the CEO.

MacLaughlan obtained funding from Joddes Limited ("Parent"), a Canadian entity that functions as the family office and umbrella investment vehicle for the Goodman family. Morris is the patriarch of the Goodman family. He cofounded Pharmascience, Inc., a Canadian pharmaceutical manufacturer, and Parent holds a controlling interest in that company. Morris resides in Canada.

---

[4] Citations in the form "Compl. ¶ ___" refer to paragraphs of the Complaint, which is the operative pleading. Dkt. 30. Citations in the form "Ex. ___ at ___" refer to exhibits to the Complaint. *Id.*

MacLaughlan argues that the defendants improperly relied on the incorporation-by-reference doctrine to introduce two exhibits with their motion to dismiss. One is an email that the Complaint implicitly referenced. Viewed in the light most favorable to the plaintiff, it supports the Complaint's allegations, so its inclusion was immaterial. The other exhibit is a securities filing that the defendants submitted to address an issue that this decision need not reach. The defendants' foot-fault does not warrant any consequence.

Under a Stock Purchase and Stockholders Agreement (the "Governance Agreement"),[5] Parent committed to provide the Company with up to $7.5 million in funding. In return, Parent would receive up to 13,240,000 shares of Series A preferred stock (the "Preferred Stock"). Upon signing, Parent invested $500,000 in the Company and received 882,667 shares of Preferred Stock. The Governance Agreement split the rest of the funding into tranches that the Company could draw after hitting developmental milestones. Each time Parent funded a tranche, it would receive the right to purchase additional shares of Preferred Stock.

The Governance Agreement called for the Company to maintain a board of directors with three seats (the "Board"). The Governance Agreement gave MacLaughlan the right to appoint one director, and he appointed himself. The Governance Agreement gave Parent the right to appoint two directors, and it appointed Morris and Isabelle Trempe, an executive with a Canadian pharmaceutical company called Knight Therapeutics, Inc. ("Knight"). Jonathan Goodman, Morris's son, founded Knight, serves as its executive chairman, and is its largest stockholder. The Governance Agreement required Board approval, "includ[ing] the affirmative vote of all [Parent's appointees]," before the Company could "enter new lines of business."[6]

---

[5] Ex. B.

[6] *Id.* § 3.

6

## B.     The Orphan Drug

In 2015, Jonathan approached MacLaughlan about Impavido, a drug owned by Knight. The FDA had granted orphan drug status to Impavido, so this decision calls it the "Orphan Drug."[7] Knight needed a partner to launch the Orphan Drug in the United States. Jonathan asked MacLaughlan to launch the Orphan Drug in return for 30% of the profits.

A company launching a drug in the United States must obtain a license from the FDA and from every state where the company does business. The licensing process can be expensive, and Knight expected the Orphan Drug to generate approximately $1 million in annual sales. Jonathan and MacLaughlan agreed that it did not make financial sense for MacLaughlan to form a separate company and pursue the necessary licenses. Instead, they agreed that the Company would license the rights from Knight and carry out the launch, but that MacLaughlan's 30% share of the profits would still go to MacLaughlan personally (the "Oral Profits Agreement").

MacLaughlan contends that Morris approved the Oral Profits Agreement. According to MacLaughlan, Morris said that formal Board-level approval for the Oral

---

[7] A drug can qualify for orphan drug status if it is intended to treat a condition affecting fewer than 200,000 people in the United States or if it will not be profitable within seven years after FDA approval.

7

Profits Agreement was not necessary, and MacLaughlan accepted that. It is not clear why they thought that.[8]

On September 25, 2015, the Company entered into a Distribution and License Agreement with Knight Therapeutics (USA) Inc., a Knight subsidiary, that covered the Orphan Drug (the "Orphan Drug Agreement"). The Orphan Drug Agreement does not reference the Oral Profits Agreement.

The Company launched the Orphan Drug in the United States on March 16, 2016. MacLaughlan then secured orphan drug designations for five new indications and patented two off-label uses, and he successfully marketed the Orphan Drug for those uses. As a result, the Orphan Drug generated far more profits than expected, with the off-label indications responsible for approximately 80% of its sales. In total, the Orphan Drug has generated some $56 million in profits. Consistent with the Oral Profits Agreement, the Company has paid 70% of the profits, or some $39 million, to Knight.

---

[8] Perhaps they thought that because Morris and MacLaughlan constituted two of the three directors, their joint approval was sufficient for Board-level signoff? The Complaint suggests that MacLaughlan attributed significance to Morris's control of Parent, so maybe they had some theory about Morris and MacLaughlan's approval constituting ratification by a stockholder supermajority (the only other stockholders were a few employees)? The email the defendants introduced in which Morris inferably rejects the need for specific Board approval suggests he was shooting from the hip. "Men often act first and think afterwards." F. W. Maitland, *Trust and Corporation, in State, Trust and Corporation* 75, 89 (David Runciman & Magnus Ryan eds., 2003).

**C.  Morris Asserts The Diversion Claim.**

The Company continued to hit the milestones for Genarest that triggered Parent's funding obligations, but development was taking more time than expected. Rather than draw on Parent's funding commitments, MacLaughlan used his share of the profits from the Orphan Drug to fund the Company's efforts to develop Genarest.

At some point in 2016, Morris asserted that MacLaughlan's 30% share of the Orphan Drug's profits belonged to the Company, rather than to MacLaughlan personally. If true, then MacLaughlan had wrongfully diverted those funds (the "Diversion Claim"). In early 2017, the parties discussed potentially revising the Governance Agreement to address the Diversion Claim, but neither side made a formal proposal. In April 2017, MacLaughlan declined to revise the Governance Agreement. He took the position that the Company only had intellectual property rights related to Genarest and never had any rights to the Orphan Drug or the revenue it generated.

Because of the disagreement over the Diversion Claim, MacLaughlan formed Profounda Health & Beauty, Inc. (the "Separate Entity") in September 2019. Since then, MacLaughlan has pursued all of his pharmaceutical-related activities other than Genarest through the Separate Entity. MacLaughlan has been transferring his 30% share of the profits from the Orphan Drug to the Separate Entity, and he shifted the Company's operational expenses to the Separate Entity, including its rent, utilities, and payroll.

9

**D.      Genarest Fails To Receive FDA Approval.**

In April 2022, the Company sought FDA approval for Genarest. In May, the FDA denied the application and stated that some of the supporting studies needed to be re-done. That work would cost $1.5 to $2 million.

Morris did not want to fund those costs. In March 2023, he told MacLaughlan that Parent and the Company should part ways. In June, he asked MacLaughlan to have the Company repurchase Parent's equity for its invested capital of $4.5 million. Morris claimed the money had been an interest-free loan rather than a capital contribution.

MacLaughlan countered that the Company should dissolve and wind down its affairs. Morris disagreed.

**E.      Morris Investigates The Diversion Claim.**

After MacLaughlan rejected Morris's repurchase proposal, Morris began to investigate the Diversion Claim. On August 21, 2023, on behalf of Parent, Morris demanded virtually all of the Company's books and records. MacLaughlan provided financial information about the Company, including profits from the Orphan Drug.

On February 1, 2024, Morris caused Parent to replace him and Parent's other Board designee with Gregory Orleski, Pharmascience's Vice President and General Counsel, and Ilana Einheiber, Parent's CFO. Orleski immediately called a special meeting of the Board for February 27, to review the Company's finances, including management's compensation. During the meeting, Orleski and Einheiber asserted the Diversion Claim. Since that Board meeting, Orleski and Einheiber have

10

reiterated the Diversion Claim. MacLaughlan has rejected the Diversion Claim and countered that the Company should dissolve and wind up its operations. Orleski and Einheiber have refused to address his dissolution proposal.

On February 6, 2024, just days after Parent replaced its Board designees, Jonathan contacted MacLaughlan about the Orphan Drug Agreement, which was up for renewal in 2025. MacLaughlan had previously reached out to Jonathan to discuss renewing the Orphan Drug Agreement. Jonathan reported to MacLaughlan that Marc Rouleau, Parent's President and CEO, had told him not to communicate with MacLaughlan.

On May 28, 2024, MacLaughlan sent a formal letter to Jonathan about renewing the Orphan Drug Agreement. Jonathan did not meaningfully respond.

On June 6, 2024, MacLaughlan called a special meeting of the Company's stockholders to consider dissolution. Parent objected, and the two sides agreed to schedule the meeting for September 6.

On August 7, 2024, one of Knight's outside directors told MacLaughlan that Knight would not renew the Orphan Drug Agreement because of the dispute over the Diversion Claim. On September 5, Knight asserted that the Company had failed to commit to industry-standard pharmacovigilance and quality-control agreements. An agreement addressing those issues already existed between Knight and the Company.

In the same letter, Knight exercised its right to conduct an in-person quality audit of the Company. Knight also exercised its right to conduct a financial audit of

11

the Company. Knight has the right to conduct audits, but it had only conducted one virtual quality audit in the past nine years.

MacLaughlan believes that all of these actions are related. He thinks Morris knows the Diversion Claim is meritless, but is using Parent's control over the Company and his influence over Jonathan and Knight to pressure MacLaughlan into buying back Parent's Preferred Stock.

## F.     The Committee

On September 4, 2024, Orleski and Einheiber held a special meeting of the Board. Rouleau also attended. MacLaughlan objected that the meeting had not been properly noticed.

During the meeting, Orleski and Einheiber appointed themselves to a special committee (the "Committee") empowered to investigate the Diversion Claim. They suspended any payments to the Separate Company pending the outcome of their investigation. MacLaughlan objected to the creation of the Committee. He asserted that Orleski and Einheiber were not disinterested directors and could not conduct an independent investigation given their close ties to Morris and Parent.

On September 6, 2024, MacLaughlan convened a special meeting of the Company's stockholders. The stockholders approved a resolution declaring that Genarest's further development was not commercially practicable. The resolution also declared that the Board should develop a plan to dissolve the Company and wind

up its affairs within fifteen days (the "Dissolution Resolution").[9] Parent was not present and did not vote, so the stockholders' approval was not unanimous.[10]

The Board did not comply with the Dissolution Resolution. On October 18, 2024, Orleski and Einheiber proposed conditioning any dissolution of the Company on the results of the Committee's investigation. MacLaughlan reiterated his view that the Company should dissolve.

## G. This Litigation

On October 31, 2024, MacLaughlan filed this lawsuit. The Complaint asserts five counts.

Count I asserts a claim for breach of fiduciary duty against Parent, Morris, Orleski, and Einheiber. The Complaint alleges that all four defendants breached their duty of loyalty to the Company by pursuing the Diversion Claim, including through Parent and Morris's decision to place Orleski and Einheiber on the Board, Orleski and Einheiber's demands relating to the Diversion Claim, and Orleski and Einheiber's decision to form the Committee to investigate and potentially pursue the Diversion Claim. The Complaint alleges that Orleski and Einheiber also breached their fiduciary duties by not complying with the Dissolution Resolution. The Complaint alleges that Parent separately breached its duty of loyalty by instructing

---

[9] Ex. M.

[10] *Id.* at 1 (listing "Joddes Ltd" as "Not Present").

13

Knight, its affiliate, not to communicate with MacLaughlan about renewing the Orphan Drug Agreement.

Count II seeks a declaratory judgment regarding the existence of the Oral Profits Agreement. The Complaint asks the court to declare that MacLaughlan, not the Company, possesses the right to 30% of the profits from the Orphan Drug.

Count III asserts a derivative claim for breach of fiduciary duty against Morris, Orleski, and Einheiber. The Complaint alleges that Orleski and Einheiber breached their duty of loyalty by pursuing the Diversion Claim, citing the same conduct described in Count I. The Complaint asserts that Morris "ignored his duties as a director of [the Company by] not participating in the business decisions of [the Company] for years until he felt his $4.5 million investment in the Company (via [Parent]) was at risk."[11]

Count IV asserts a claim for civil conspiracy. The Complaint alleges that to the extent Parent, Morris, Orleski, or Einheiber did not owe fiduciary duties and breach them, they conspired with those who did.

Count V asserts a claim for tortious interference with contract against Parent and Morris. The Complaint contends that Parent and Morris unjustifiably interfered with the renewal of the Orphan Drug Agreement by instructing Knight employees not to communicate with the Company, instructing Knight to conduct burdensome

---

[11] Compl. ¶ 201(a).

14

and expensive audits of the Company, and obtaining confidential information about the Orphan Drug from Jonathan.

## II.    PARENT'S RULE 12(B)(2) MOTION

Both Parent and Morris moved for dismissal under Rule 12(b)(2) because they contend the court cannot exercise personal jurisdiction over them. Personal jurisdiction often presents a threshold question that a court can and should address up front, before reaching the merits.[12] For Parent's motion, that is true. The court lacks personal jurisdiction over Parent.

For Morris, the answer is more complicated. To establish personal jurisdiction over Morris, MacLaughlan relies on the Delaware statute under which directors implicitly consent to jurisdiction in Delaware when they agree to serve (the "Director Consent Statute").[13] That statute provides jurisdiction for claims against Morris in his capacity as a director. It also provides jurisdiction for claims against Morris in his non-director capacities if there is a viable claim against Morris in his capacity as a director and a sufficient factual relationship between the director-capacity claim and the non-director-capacity claims. Morris's motion therefore turns on the merits of the

---

[12] *See Branson v. Exide Elecs. Corp.*, 625 A.2d 267, 268–69 (Del. 1993) ("This Court has concluded that the Court of Chancery should have decided the personal jurisdictional challenge regarding the individual defendants, raised by Exide's motion to dismiss, prior to addressing the substantive aspect of that motion with respect to all defendants. Accordingly, this matter will be remanded to the Court of Chancery for that purpose.").

[13] 10 *Del. C.* § 3114(a).

15

claims against him as a director. This decision evaluates Parent's motion now and Morris's motion later.

"Generally, a plaintiff does not have the burden to plead in its complaint facts establishing a court's personal jurisdiction over defendant."[14] However, "[w]hen a defendant moves to dismiss a complaint pursuant to Court of Chancery Rule 12(b)(2), the plaintiff bears the burden of showing a basis for the court's exercise of jurisdiction over the defendant."[15] That burden is an evidentiary one.[16] A verified complaint satisfies the requirements for an affidavit and can provide the necessary evidentiary support.[17] But the court is not limited to the allegations of the complaint and can consider evidentiary submissions.[18] If the court has not conducted an evidentiary

---

[14] *Benerofe v. Cha*, 1996 WL 535405, at *3 (Del. Ch. Sep. 12, 1996).

[15] *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[16] *Hart Hldg. Co. Inc. v. Drexel Burnham Lambert Inc.*, 593 A.2d 535, 538 (Del. Ch. 1991) (Allen, C.).

[17] *See Bruce E. M. v. Dorothea A. M.*, 455 A.2d 866, 869 (Del. 1983) ("A verified pleading may also be used as an affidavit if the facts stated therein are true to the party's own knowledge."); *accord Weber v. Kirchner*, 2003 WL 23190392, at *3 (Del. Ch. Dec. 31, 2003); *Taylor v. Jones*, 2002 WL 31926612, at *2 & n.6 (Del. Ch. Dec. 17, 2002).

[18] *Sample v. Morgan* (*Sample II*), 935 A.2d 1046, 1055–56 (Del. Ch. 2007) ("In considering a motion to dismiss for lack of personal jurisdiction under Court of Chancery Rule 12(b)(2), I am not limited to the pleadings. Rather, I am 'permitted to rely upon the pleadings, proxy statement, affidavits, and briefs of the parties in order to determine whether the defendants are subject to personal jurisdiction.'" (quoting *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 974 (Del. Ch. 2000)); *Ryan*, 935 A.2d at 265 ("In ruling on a Rule 12(b)(2) motion, the court may consider the pleadings, affidavits, and any discovery of record.").

hearing, then a plaintiff "need only make a *prima facie* showing" sufficient to support jurisdiction, with the record construed "in the light most favorable to the plaintiff."[19] If the court takes that approach, then the jurisdictional question technically remains open until trial, when the plaintiff must prove the jurisdictional facts by a preponderance of the evidence.[20] Often, the jurisdictional challenge falls by the wayside, but not always.[21]

The facts necessary to establish personal jurisdiction are often in the defendant's control.[22] A plaintiff therefore ordinarily may not be precluded from

---

[19] *Sprint Nextel Corp. v. iPCS, Inc.*, 2008 WL 2737409, at *5 (Del. Ch. July 14, 2008); *see Sample II*, 935 A.2d at 1056 ("In evaluating the record [on a Rule 12(b)(2) motion], I must draw reasonable inferences in favor of the plaintiff."); *Ryan*, 935 A.2d at 265 ("If, as here, no evidentiary hearing has been held, plaintiffs need only make a prima facie showing of personal jurisdiction and the record is construed in the light most favorable to the plaintiff." (footnotes and internal quotation marks omitted)).

[20] *Travelers Indem. Co. v. Calvert Fire Ins. Co.*, 798 F.2d 826, 831 (5th Cir. 1986) ("However, 'at any time when the plaintiff avoids a preliminary motion to dismiss by making a prima facie showing of jurisdictional facts, he must still prove the jurisdictional facts at trial by a preponderance of the evidence,' or, as otherwise stated, '[e]ventually, of course, the plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at a trial.'" (first quoting *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n.2 (9th Cir. 1977); then quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))).

[21] *See Arxada Hldgs. NA Inc. v. Harvey*, — A.3d —, —, 2026 WL 220511, at *12–13 (Del. Ch. Jan. 28, 2026).

[22] *See Harris v. Harris*, 289 A.3d 277, 296 (Del. Ch. 2023); *accord Compagnie Des Bauxites de Guinee v. L'Union Atlantique S.A. d'Assurances*, 723 F.2d 357, 362 (3d Cir. 1983); *Surpitski v. Hughes-Keenan Corp.*, 362 F.2d 254, 255–56 (1st Cir. 1966).

17

conducting a reasonable amount of jurisdictional discovery.[23] "Only where the facts alleged in the complaint make any claim of personal jurisdiction over defendant frivolous, might the trial court, in the exercise of its discretionary control over the discovery process, preclude reasonable discovery in aid of establishing personal jurisdiction."[24] As long as the plaintiff has provided "some indication" that the particular defendant is amenable to suit, then jurisdictional discovery is appropriate.[25]

Under Delaware law, the exercise of personal jurisdiction has two requirements.[26] First, the plaintiff must identify a valid method of serving process on the defendant. Second, the exercise of personal jurisdiction through the service of process must rest on sufficient minimum contacts between the defendant and Delaware that it "does not offend traditional notions of fair play and substantial justice."[27]

---

[23] *Harris*, 289 A.3d at 296; *accord Hart*, 593 A.2d at 539 ("As a plaintiff does have an evidentiary burden, she may not be precluded from attempting to prove that a defendant is subject to the jurisdiction of the court, and may not ordinarily be precluded from reasonable discovery in aid of mounting such proof.").

[24] *Hart*, 593 A.2d at 539; *accord Harris*, 289 A.3d at 296.

[25] *Hansen v. Neumueller GmbH*, 163 F.R.D. 471, 475 (D. Del. 1995); *see Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1977) ("[W]here issues arise as to jurisdiction or venue, discovery is available to ascertain the facts bearing on such issues.").

[26] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023, 1027 (Del. 2012).

[27] *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

To establish personal jurisdiction over Parent, MacLaughlan relies on the conspiracy theory of jurisdiction.[28] MacLaughlan's effort to invoke that theory fails.

## A.   The Test For Conspiracy Jurisdiction

Under the conspiracy theory of jurisdiction,

> a conspirator who is absent from the forum state is subject to the jurisdiction of the court, assuming he is properly served under state law, if the plaintiff can make a factual showing that: (1) a conspiracy to defraud existed; (2) the defendant was a member of that conspiracy; (3) a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state; (4) the defendant knew or had reason to know of the act in the forum state or that acts outside the forum state would have an effect in the forum state; and (5) the act in, or effect on, the forum state was a direct and foreseeable result of the conduct in furtherance of the conspiracy.[29]

The theory rests "on the legal principle that one conspirator's acts are attributable to the other conspirators."[30] Thus, "if the purposeful act or acts of one conspirator are of a nature and quality that would subject the actor to the jurisdiction of the court, all of the conspirators are subject to the jurisdiction of the court."[31]

By satisfying the requirements for the conspiracy theory of jurisdiction, a plaintiff satisfies both elements of the two-prong jurisdictional test. The first three

---

[28] *See id.*

[29] *Istituto Bancario Italiano SpA v. Hunter Eng'g Co., Inc.*, 449 A.2d 210, 225 (Del. 1982).

[30] *Fläkt Woods*, 56 A.3d at 1027.

[31] *Istituto Bancario*, 449 A.2d at 222.

19

*Istituto Bancario* elements satisfy the requirements for serving process under Delaware's long-arm statute (the "Long-Arm Statute"). That statute states:

> As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent: (1) Transacts any business or performs any character of work or service in the State . . . .[32]

The forum-directed activity can be accomplished "through an agent."[33] "[A] single transaction is sufficient to confer jurisdiction where the claim is based on that transaction."[34]

The first three *Istituto Bancario* elements track the statutory requirements of the Long-Arm Statute. Meeting the third *Istituto Bancario* element—showing that a "substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state"[35]—satisfies the Long-Arm Statute's requirement that the defendant transact business or perform work in Delaware. Meeting the first and second *Istituto Bancario* elements—the existence of a conspiracy and the defendant's membership in it—imputes the jurisdiction-conferring act to the defendant under agency

---

[32] 10 *Del. C.* § 3104(c)(1).

[33] *Id.* § 3104(c).

[34] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 978 (Del. Ch. 2000) (internal quotation marks omitted); *accord LaNuova D & B, S.p.A. v. Bowe Co., Inc.*, 513 A.2d 764, 768 (Del. 1986).

[35] *Istituto Bancario*, 449 A.2d at 225.

20

principles.[36] The conspiracy theory thus may not be an independent basis for establishing personal jurisdiction, but meeting the first, second, and third elements meets the Long-Arm Statute's requirements.

The third, fourth, and fifth elements address the constitutional dimension. The third element requires more than just any act or effect in Delaware; it demands "a substantial act or substantial effect in furtherance of the conspiracy."[37] That requirement speaks to the sufficiency of the forum-directed contacts. The fourth and fifth elements—whether the defendant "knew or had reason to know of" the forum-directed activity and the degree to which the forum-directed activity was "a direct and foreseeable result of the conduct in furtherance of the conspiracy"[38]—address whether the defendant could reasonably anticipate being sued in Delaware.[39] "[A] defendant who has so voluntarily participated in a conspiracy with knowledge of its acts in or effects in the forum state can be said to have purposefully availed himself of the privilege of conducting activities in the forum state, thereby fairly invoking the

---

[36] *Hercules Inc. v. Leu Tr. & Banking (Bahamas) Ltd.*, 611 A.2d 476, 481 (Del. 1992) ("[C]onspirators are considered agents for jurisdictional purposes."); *accord Carlton Invs. v. TLC Beatrice Int'l Hldgs., Inc.*, 1995 WL 694397, at \*12 (Del. Ch. Nov. 21, 1995) (Allen, C.).

[37] *Istituto Bancario*, 449 A.2d at 225.

[38] *Id.*

[39] *See Carlton Invs.*, 1995 WL 694397, at \*12.

21

benefits and burdens of its laws."[40] Where the third, fourth, and fifth elements are satisfied, a defendant has sufficient minimum contacts with Delaware to satisfy due process.

**B.    The Absence Of A Substantial Delaware-Directed Act**

MacLaughlan's effort to invoke the conspiracy theory cannot satisfy the third element: "a substantial act or substantial effect in furtherance of the conspiracy occurred in the forum state."[41] The Complaint fails to identify a single Delaware-directed act that could meet this requirement.

MacLaughlan alleges that Parent, through Morris, Einheiber, and Orleski, weaponized the Company's corporate form to further its own interests, including by creating the Committee to investigate the Diversion Claim. MacLaughlan asserts that a conspiracy designed to facilitate a breach of fiduciary duty against a minority stockholder in a Delaware corporation satisfies the third *Istituto Bancario* element, citing *Crescent*.[42] To the contrary, *Crescent* challenged a merger between two Delaware corporations, effectuated using Delaware law and consummated through the filing of a certificate of merger with the Delaware Secretary of State.[43] That

---

[40] *Istituto Bancario*, 449 A.2d at 225; *accord Hercules*, 611 A.2d at 482 n.6 (explaining that the conspiracy theory "provides a framework with which to analyze a foreign defendant's contacts with Delaware").

[41] *Istituto Bancario*, 449 A.2d at 225.

[42] *Crescent*, 846 A.2d 963.

[43] *Id.* at 977.

22

Delaware act satisfied the third element of the *Istituto Bancario* test and served as the cornerstone for the assertion of conspiracy jurisdiction. The nature of the claim, its support in Delaware law, and the injury to minority stockholders in a Delaware corporation helped satisfy the due process requirement. It did not supply the Delaware-directed act.

MacLaughlan is not entitled to conduct jurisdictional discovery in search of a Delaware-directed act. He has not alleged any combination of facts that could suggest the existence of a Delaware-directed act. Jurisdictional discovery would require trawling for a Delaware nexus. A party must have some general idea where to search.

Because MacLaughlan has failed to identify a valid method of serving process on Parent, the assertion of jurisdiction fails. The court need not address due process. Parent's motion to dismiss under Rule 12(b)(2) is granted.

Counts I, II, IV, and V name Parent as a defendant. The court lacks personal jurisdiction over Parent, so the court does not address the claims against Parent that appear in those counts.

## III. THE CLAIMS AGAINST THE DIRECTORS FOR BREACH OF FIDUCIARY DUTY

Counts I and III assert that Morris, Orleski, and Einheiber breached their fiduciary duties as directors by (1) asserting and investigating the Diversion Claim and (2) failing to abide by the Dissolution Resolution. Count I asserts these theories as direct claims. Count III asserts the theories as derivative claims.

Evaluating whether the claims are derivative or direct is less helpful than analyzing their merits. For purposes of the Diversion Claim-related allegations,

23

MacLaughlan tries to state a direct claim by arguing that the directors breached fiduciary duties they owed *to him*. For the reasons that follow, that framing fails to state a claim on which relief can be granted because the directors do not owe fiduciaries to MacLaughlan; they owe fiduciary duties to the corporation and its stockholders as a whole.

Count III contends that the Diversion Claim-related allegations support a claim that the directors breached their duties to the Company. That is a derivative claim, and the defendants invoke Rule 23.1 by arguing that demand was not futile. The Complaint attacks Orleski and Einheiber's ability to consider a demand. Demand futility turns in the first instance on whether it is reasonably likely that Orleski or Einheiber faces a substantial risk of liability.[44] Demand futility turns in the second instance on whether Morris is either interested in the Diversion Claim or faces a substantial risk of liability for his actions relating to the Diversion Claim, because Orleski and Einheiber are beholden to Morris as officers of his affiliated entities.[45]

When demand futility turns on whether a defendant faces a substantial risk of liability, a court can simply analyze the claim.[46] The Delaware Supreme Court

---

[44] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1058 (Del. 2021).

[45] *Id.*

[46] *Hanna v. Paradise*, 2025 WL 1836642, at *8 (Del. Ch. July 3, 2025) ("Because showing that a defendant faces a substantial likelihood of liability from a claim requires that the claim be legally viable, the Rule 23.1 analysis as to Wakeford effectively folds into the Rule 12(b)(6) analysis of the *Brophy* claim against him.").

introduced the substantial-risk-of-liability test to ensure that a plaintiff could not disqualify a director from considering a demand simply by naming the director as a defendant.[47] The goal of the inquiry was to guard against strike suits.[48] To satisfy the test, a plaintiff need only "make a threshold showing" that its claims "have some merit."[49] Although precedent calls for "particularized facts," that requirement does not change the principle that the plaintiff receives the benefit of favorable inferences on a pleading-stage motion to dismiss. "When considering a motion to dismiss a

---

[47] *Aronson v. Lewis*, 473 A.2d 805, 814–15 (Del. 1984). By introducing this test, *Aronson* marked a sea change in Delaware law and departed from longstanding precedent, including *McKee v. Rogers*, 156 A. 191 (Del. Ch. 1931) (Wolcott, C.), *Miller v. Loft, Inc.*, 153 A. 861 (Del. Ch. 1931) (Wolcott, C.), and *Fleer v. Frank H. Fleer Corp.*, 125 A. 411 (Del. Ch. 1924) (Wolcott, C.). The historical context suggests that *Aronson* responded to a practitioner contretemps over *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981). Many commentators had expressed fear that *Zapata* undermined the business judgment rule. *See In re EZCORP Inc. Consulting Agreement Deriv. Litig.*, 2016 WL 301245, at *26 (Del. Ch. Jan. 25, 2016) (collecting authorities). The *Aronson* decision provided an opportunity to calm the waters by reinforcing Rule 23.1 as a pleading-stage bulwark against weak derivative claims.

*Aronson* itself has been cabined. In *Brehm v. Eisner*, the Delaware Supreme Court overruled seven decisions, including *Aronson*, to the extent those precedents reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. 746 A.2d 244, 253 n.13 (Del. 2000). The *Brehm* Court held that going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. More recently, in *Zuckerberg*, the Delaware Supreme Court overruled *Aronson*'s test for demand futility and incorporated it into a new, unified test. 262 A.3d at 1059. Despite *Aronson*'s strategic origins and complicated subsequent history, the case stands for other propositions that remain foundational to Delaware law.

[48] *See Hanna*, 2025 WL 1836642, at *8.

[49] *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993), *overruled in part on other grounds by Zuckerberg*, 262 A.3d 1034.

25

complaint for failing to comply with Rule 23.1, the Court does not weigh the evidence, must accept as true all of the complaint's particularized and well-pleaded allegations, and must draw all reasonable inferences in the plaintiff's favor."[50] A plaintiff need only plead facts that support a claim; "he need not plead evidence."[51]

Compare the resulting pleading standard with how Delaware courts apply Rule 12(b)(6) when evaluating direct claims for breach of fiduciary duty. There too, a plaintiff must plead "specific facts" and cannot rely on "conclusory allegations."[52] There too, "the trial court is not required to accept every strained interpretation of the allegations proposed by the plaintiff," but only "reasonable inferences that

---

[50] *Zuckerberg*, 262 A.3d at 1048.

[51] *Aronson*, 473 A.2d at 816; *accord Brehm*, 746 A.2d at 254 ("[T]he pleader is not required to plead evidence.").

[52] *See Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) ("We decline . . . to accept conclusory allegations unsupported by specific facts . . . ."); *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) ("We do not . . . blindly accept conclusory allegations unsupported by specific facts . . . ."); *Gantler v. Stephens*, 965 A.2d 695, 704 (Del. 2009) (same); *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008) (stating that "conclusory allegations need not be treated as true"); *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 168 (Del. 2006) ("A trial court is not . . . required to accept as true conclusory allegations without specific supporting factual allegations." (internal quotation marks omitted)); *Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996) ("[C]onclusions . . . will not be accepted as true without specific allegations of fact to support them." (internal quotation marks omitted)). Some decisions even cite derivative action precedents when framing the Rule 12(b)(6) pleading standard. *E.g.*, *In re Nat'l Auto Credit, Inc. S'holders Litig.*, 2003 WL 139768, at *12 (Del. Ch. Jan. 10, 2003) (citing *Grobow v. Perot*, 539 A.2d 180, 187–88 & n.6 (Del. 1988), *overruled in part on other grounds by Brehm*, 746 A.2d 244); *Cal. Pub. Emps.' Ret. Sys. v. Coulter*, 2002 WL 31888343, at *15 (Del. Ch. Dec. 18, 2002) (same).

logically flow from the face of the complaint."[53] To be sure, cases contrast the

particularized pleading standard under Rule 23.1 with the notice pleading standard

under Rules 8 and 12(b)(6),[54] and for allegations of director disinterestedness and

---

[53] *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001); *accord Page v. Oath Inc.,* 270 A.3d 833, 842 (Del. 2022); *Caspian Alpha Long Credit Fund, L.P. v. GS Mezzanine P'rs 2006, L.P.*, 93 A.3d 1203, 1205 (Del. 2014); *Gen. Motors*, 897 A.2d at 168; *see Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013) ("We do not, however, credit conclusory allegations that are not supported by specific facts, or draw unreasonable inferences in the plaintiff's favor.").

[54] *E.g.*, *Zuckerberg*, 262 A.3d at 1048; *Brehm*, 746 A.2d at 254; *Malpiede*, 780 A.2d at 1083; *Solomon,* 672 A.2d at 39.

independence, the distinction can be meaningful.[55] But for the factual allegations giving rise to a cognizable claim, the standards functionally align.[56]

---

[55] *E.g., In re The Student Loan Corp. Deriv. Litig.*, 2002 WL 75479, at *3 (Del. Ch. Jan. 8, 2002); *Akins v. Cobb,* 2001 WL 1360038, at *5 (Del. Ch. Nov. 1, 2001); *Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1054 (Del. Ch. 1996) (Allen, C.).

From a purely textual perspective, it is not clear that the particularity requirement applies to the merits allegations supporting a claim. During the development of demand futility law, Rule 23.1 stated: "The complaint [shall] . . . allege with particularity the efforts, if any, made by the plaintiff to obtain the action he desires from the directors or comparable authority and the reasons for his failure to obtain the action or for not making the effort." That language requires particularity about "efforts" and "reasons." It sought to require more than a bare allegation that "demand would be futile" or slightly more detailed allegations that demand would be futile because the defendants would have to sue themselves, suffer from structural bias, or participated in the challenged transaction. *See* Michael P. Dooley & E. Norman Veasey, *The Role of the Board in Derivative Litigation: Delaware Law and the Current ALI Proposals Compared*, 44 Bus. Law. 503, 506 (1989). To my mind, it requires an interpretive stretch to read that language to require particularity in the factual allegations about the underlying claim that gives rise to a reason for not making the effort—or at least greater factual specificity than Delaware law already requires for breach of fiduciary duty claims.

[56] *L.A. City Emps.' Ret. Sys. v. Sanford*, — A.3.d —, —, 2026 WL 125986, at *39 (Del. Ch. Jan. 16, 2026) (collecting authorities); *see McPadden v. Sidhu*, 964 A.2d 1262, 1270 (Del. Ch. 2008) ("Because the standard under Rule 12(b)(6) is less stringent than that under Rule 23.1, a complaint that survives a motion to dismiss pursuant to Rule 23.1 will also survive a 12(b)(6) motion to dismiss, *assuming that it otherwise contains sufficient facts to state a cognizable claim.*" (emphasis added) (footnote omitted)); *accord Reith v. Lichtenstein,* 2019 WL 2714065, at *6 (Del. Ch. June 28, 2019). While serving on this court, for example, Justice Jacobs justified the pleading distinction by noting that "a motion to dismiss under Rule 23.1 is not intended to test the legal sufficiency of the plaintiff's substantive claim." *Levine v. Smith*, 1989 WL 150784, at *5 (Del. Ch. Nov. 27, 1989), *aff'd*, 591 A.2d 194 (Del. 1991). In other words, the heightened pleading requirement addresses disinterestedness and independence. *Id.*

Finally, the claim for failure to adhere to the Dissolution Resolution is direct in any event. MacLaughlan claims that the stockholder-level Dissolution Resolution bound the directors and they breached their duties by failing to comply with the stockholders' right to have the Company dissolved. Rule 12(b)(6) is the proper framework for a pleading-stage challenge to that claim.[57]

## A.    The Elements Of A Claim For Breach Of Fiduciary Duty

To plead a claim for breach of fiduciary duty, a complaint need only address two elements: "(1) that a fiduciary duty existed and (2) that the defendant breached that duty."[58] For the allegations related to the Diversion Claim, the first element is met. The second is not.

### 1.    Fiduciary Status

The Complaint pleads that Morris, Orleski, and Einheiber are fiduciaries. The Complaint pleads that all served as directors and allegedly acted wrongfully in that

---

[57] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011) (articulating standard).

[58] *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch.), *aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749 (Del. 2010).

capacity. For over two centuries, American courts have treated corporate directors as fiduciaries.[59] Today, the proposition is axiomatic.[60]

## 2. Breach

The element of breach is more nuanced. When determining whether corporate fiduciaries have breached their duties when pursuing a transaction, Delaware law distinguishes between the standard of conduct and the standard of review. Although

---

[59] The seminal American decision is *Attorney General v. Utica Insurance Co.*, 2 Johns Ch. 371 (N.Y. Ch. 1817), an opinion by Chancellor James Kent, the renowned Chancellor of New York and author of *Commentaries on American Law* (1826–30). The first Delaware decisions appear some seventy years later. *See Walker's Adm'x v. Farmers' Bank*, 14 A. 819, 831 (Del. 1888); *Diamond State Iron Co. v. Todd*, 14 A. 27, 30 (Del. Ch. 1888), *aff'd*, 13 Del. (8 Houst.) 372 (Del. Jan. 16, 1889). Chancellor Charles M. Curtis, who served from 1909 to 1921, provided Delaware's first meaningful consideration of the duties of corporate fiduciaries in decisions like *Martin v. D.B. Martin Co.*, 88 A. 612 (Del. Ch. 1913), and *Cahall v. Lofland*, 114 A. 224 (Del. Ch. 1921), *aff'd*, 118 A. 1 (Del. 1922). His successor, Chancellor Josiah O. Wolcott, served from 1921 until 1938 and was one of Delaware's great jurists. Among Chancellor Wolcott's contributions are several decisions addressing the role of directors as fiduciaries for the stockholders. *See, e.g.*, *Harden v. E. States Pub. Serv. Co.*, 122 A. 705 (Del. Ch. 1923); *Roberts v. Kennedy*, 116 A. 253 (Del. Ch. 1922). Both Chancellors presided during the period after New Jersey adopted the Seven Sisters Acts, which opened the door for an envious upstart (as Delaware then was) to compete for the chartering business. *See* Charles M. Yablon, *The Historical Race Competition for Corporate Charters and the Rise and Decline of New Jersey: 1880-1910*, 32 J. Corp. L. 323, 359–67 (2007) (discussing the so-called charter-mongering states that sought to emulate New Jersey and garner out-of-state incorporations, including Delaware, Maine, West Virginia, and South Dakota); Joel Seligman, *A Brief History of Delaware's General Corporation Law of 1899*, 1 Del. J. Corp. L. 249, 270 (1976) (discussing the Seven Sisters Acts). Both Chancellors played major—and today underappreciated—roles in establishing this court's reputation as a venue for corporate cases.

[60] *Aronson*, 473 A.2d at 811 ("The existence and exercise of [the board's authority under Section 141(a)] carries with it certain fundamental fiduciary obligations to the corporation and its shareholders.").

Delaware decisions traditionally did not acknowledge that distinction,[61] Delaware jurists now do so openly to explain the divergence between the normative framing of what fiduciary duties require and their practical application to the facts of a case.[62]

With the distinction acknowledged, the standard of conduct describes what corporate fiduciaries are expected to do and is defined by the content of the duties of loyalty and care.[63] The standard of review is the test that a court applies when evaluating whether directors have met the standard of conduct.[64]

---

[61] *See* David Kershaw, *The Foundations of Anglo-American Corporate Fiduciary Law* 185, 221–22 (2018). Despite the lack of open acknowledgement, the divergence could be seen in earlier cases, such as decisions distinguishing between the articulated duty of directors to exercise reasonable care and the liability standard of gross negligence. *See, e.g.*, *Aronson*, 473 A.2d at 812; *In re Walt Disney Deriv. Litig.* (*Disney I*), 907 A.2d 693, 749–50 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006). Professor Kershaw notes that New York cases maintained a similar distinction from the late nineteenth century until the codification of the fiduciary standard of care in 1961. *See* Kershaw, *supra*, at 185–86.

[62] *See, e.g.*, *Manti Hldgs., LLC v. Carlyle Gp. Inc.*, 2022 WL 1815759, at *7 (Del. Ch. June 3, 2022) (Glasscock, V.C.); *Totta v. CCSB Fin. Corp.*, 2022 WL 1751741, at *15 (Del. Ch. May 31, 2022) (McCormick, C.), *aff'd*, 302 A.3d 387 (Del. 2023); *In re MultiPlan Corp. S'holders Litig.*, 268 A.3d 784, 809 (Del. Ch. 2022) (Will, V.C.); *In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *30 (Del. Ch. May 6, 2021) (Zurn, V.C.); *Cumming v. Edens*, 2018 WL 992877, at *18 (Del. Ch. Feb. 20, 2018) (Slights, V.C.); *In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *27 n.202 (Del. Ch. July 24, 2014) (Noble, V.C.); *Chen v. Howard-Anderson*, 87 A.3d 648, 666–67 (Del. Ch. 2014) (Laster, V.C.); *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1112 (2008) (Parsons, V.C.); *see also Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1275 n.102 (Del. 2018) (Strine, C.J.).

[63] *Chen*, 87 A.3d at 666; *In re Trados Inc. S'holder Litig.* (*Trados II*), 73 A.3d 17, 35 (Del. Ch. 2013).

[64] *Chen*, 87 A.3d at 666; *Trados II*, 73 A.3d at 35–36.

Working together, the standard of conduct and the standard of review answer Justice Felix Frankfurter's well-known questions. As he famously observed:

> But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty?[65]

The standard of conduct answers the first two questions: To whom does the fiduciary owe obligations, and what obligations are owed? The standard of review answers the third question: How has the fiduciary failed to discharge these obligations? The fourth question concerns the remedy, which is not typically at issue at the pleading stage.[66]

---

[65] *Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 85–86 (1943).

[66] A Rule 12(b)(6) motion challenges whether a plaintiff has stated a claim on which relief could be granted, not the types of relief that a plaintiff might obtain. A court determines remedies after trial, so a pleading-stage assessment is usually premature. *E.g.*, *Delawareans for Educ. Opportunity v. Carney*, 199 A.3d 109, 178 (Del. Ch. 2018) (declining to rule on remedies at the pleading stage, writing that "[w]hether and what kind of remedy issues should be addressed at a future date"); *Bear Stearns Mortg. Funding Tr. 2006-SL1 v. EMC Mortg. LLC*, 2015 WL 139731, at *17 (Del. Ch. Jan. 12, 2015) ("At the pleadings stage, the court will not rule out the possibility of other remedies, such as rescissory damages."); *see Ambac Assur. Corp. v. EMC Mortg. Corp.*, 2009 WL 734073, at *2 (S.D.N.Y. Mar. 16, 2009) (denying defendant's request to strike rescissory damages on the basis that it was premature); *Assured Guar. Mun. Corp. v. UBS Real Est. Secs., Inc.*, 2012 WL 3525613, at *7 (S.D.N.Y. Aug. 15, 2012) ("It would be premature to strike a remedy at the pleadings stage."). In some situations, however, ruling at the pleading stage on whether a remedy will be available can assist in the simplification of the case and the formulating of issues for trial, which are important parts of the trial court's case management function. *See Goldstein v. Denner*, 310 A.3d 548, 569–71 (Del. Ch. 2024) (discussing trial court's case management authority); *Sunder Energy, LLC v. Jackson*, 2023 WL 8868407, at *16 n.39 (Del. Ch. Dec. 22, 2023) (same); *Harris v. Harris*, 289 A.3d 310, 342–43 (Del. Ch. 2023) (same).

The answers to Justice Frankfurter's questions depend on the facts of each case. Fiduciary duties under Delaware law are "unremitting," meaning that they are always operative, but their application is context-dependent, meaning that "the exact course of conduct that must be charted to properly discharge that responsibility will change in the specific context of the action the [fiduciary] is taking."[67] That means that the framework of fiduciary duties can respond to new challenges and changing circumstances. It also means that the scope of equitable review technically lacks a limiting principle.[68] But directors and officers are not without guidance. The Delaware courts have sought to provide directors and officers "with clear signal

---

[67] *Malone v. Brincat*, 722 A.2d 5, 10 (Del. 1998).

[68] *See generally* Leo E. Strine, Jr. et al., *Loyalty's Core Demand: The Defining Role of Good Faith in Corporation Law*, 98 Geo. L.J. 629, 633–34 (2010) ("Because the discretion that the DGCL affords directors is so wide, it is vitally important that directors exercise this discretion to advance the corporation's best interests and not for improper purposes. . . . [I]t has been traditional for the duty of loyalty to be articulated capaciously, in a manner that emphasizes not only the obligation of a loyal fiduciary to refrain from advantaging herself at the expense of the corporation but, just as importantly, to act affirmatively to further the corporation's best interests. In this respect, our law has been clear that the duty of loyalty is implicated by all director actions because all such actions must be undertaken in good faith to advance the corporation's best interests and because directors owe an affirmative obligation to put in a good faith effort to responsibly carry out their duties."); *id.* at 639 ("Because every act of a director must be done for a proper, loyal purpose, every act in every context implicates the duty of loyalty. And because a loyal director must try to perform her acts with care, and because the law has embraced an enforceable duty of care, every act by a director implicates the duty of care.").

beacons and brightly lined-channel markers as they navigate with due care, good faith, and loyalty on behalf of a Delaware corporation and its shareholders."[69]

## B.    The Claim Based On Allegations Related The Diversion Claim

MacLaughlan's claims against the directors principally contend that Morris, Orleski, and Einheiber breached their duty of loyalty by asserting the Diversion Claim and taking steps to investigate it. He also contends that Morris acted disloyally by abdicating his duties and not paying any attention to the Company until he perceived that the Diversion Claim could be used to advance his own interests.

MacLaughlan advances two version of those claims. In one version, MacLaughlan asserts that the directors breached duties they owed *to him*. That framing seems to be why Count I styles the claim as direct. In the other version, MacLaughlan asserts that the directors breached duties they owed *to the Company*. That framing seems to be why Count III styles the claim as derivative. The former framing fails under the standard of conduct. The latter framing fails under the standard of review.

### 1.    Diversion Claim-Related Conduct And The Standard Of Conduct

Delaware corporate law starts from the bedrock principle that "[t]he business and affairs of every corporation . . . shall be managed by or under the direction of a board of directors."[70] Subject to the strictures of the Delaware General Corporation

---

[69] *Malone*, 722 A.2d at 10.

[70] 8 *Del. C.* § 141(a).

Law,[71] provisions in the charter,[72] and—most recently—any rights or obligations memorialized in a governance agreement,[73] it remains "[a] cardinal precept of [Delaware law] that directors, rather than shareholders, manage the business and affairs of the corporation."[74] "The existence and exercise of this power carries with it certain fundamental fiduciary obligations to the corporation and its shareholders."[75]

For directors, the duty of loyalty "mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director . . . and not shared by the stockholders generally."[76] Corporate fiduciaries

---

[71] *See id.* ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided in this chapter . . . .").

[72] *See id.* ("The business and affairs of every corporation organized under this chapter shall be managed by or under the direction of a board of directors, except as may be otherwise provided . . . in its certificate of incorporation. If any such provision is made in the certificate of incorporation, the powers and duties conferred or imposed upon the board of directors by this chapter shall be exercised or performed to such extent and by such person or persons as shall be provided in the certificate of incorporation.").

[73] *See id.* § 122(18).

[74] *Aronson*, 473 A.2d at 811.

[75] *Id.*; *accord Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984), *overruled in part on other grounds by Brehm*, 746 A.2d 244.

[76] *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993), *modified on other grounds*, 636 A.2d 956 (Del. 1994). When framing the standard, Delaware decisions, including *Technicolor*, state that the same duty of loyalty applies to controlling stockholders, but a more detailed examination of the cases disconfirms that simplification. *See In re Sears Hometown & Outlet Stores, Inc. S'holder Litig.*, 309 A.3d 474, 506–16 (Del. Ch. 2024); *see generally* J. Travis Laster, *The Distinctive Fiduciary Duties That Stockholder Controllers Owe*, 20 N.Y.U. J.L. & Bus. 461 (2024).

"are not permitted to use their position of trust and confidence to further their private interests."[77]

For directors, to act loyally means "to promote the value of the corporation for the benefit of its stockholders."[78] As a practical matter, that means to promote the value of the corporation for the benefit of the common stockholders in the aggregate.[79] That simplification holds because when stockholders enjoy special rights, powers, or preferences, those rights are contractual, and corporate fiduciaries do not have a fiduciary duty to maximize the value of a counterparty's contract rights.[80]

---

[77] *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939).

[78] *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 34 (Del. Ch. 2010); *accord N. Am. Cath. Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[] owners." (internal quotation marks omitted)); *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del. 1986) ("A board may have regard for various constituencies in discharging its responsibilities, provided there are rationally related benefits accruing to the stockholders."); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del. 1985) ("[O]ur analysis begins with the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders."); *see also* Leo E. Strine, Jr., *The Soviet Constitution Problem in Comparative Corporate Law: Testing the Proposition that European Corporate Law is More Stockholder Focused than U.S. Corporate Law*, 89 S. Cal. L. Rev. 1239, 1249 (2016); ("[U]nder Delaware law . . . directors are required to focus on promoting stockholder welfare."); *Loyalty's Core Demand*, *supra*, at 634 ("[I]t is essential that directors take their responsibilities seriously by actually trying to manage the corporation in a manner advantageous to the stockholders.").

[79] *See Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *21–22 (Del. Ch. Apr. 14, 2017) (collecting authorities).

[80] *Id.* (collecting authorities). Even when a subset of the stockholders enjoys special rights, powers, and preferences, there will be decisions that do not implicate those contractual rights. *Id.* (collecting authorities). In those cases, the directors must

The duty of loyalty includes a requirement to act in good faith, which is "a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty."[81] Acting in good faith requires that the director subjectively believes that the course of action is in the best interests of the corporation and its stockholders.[82] Stated conversely, a director acts in bad faith when the fiduciary "intentionally acts with a purpose other than that of advancing the best interests of the corporation."[83] "It makes no difference the reason why the director intentionally fails to pursue the best interests of the corporation."[84] Bad faith can be the result of "any human emotion [that] may cause a

---

seek to promote the value of the corporation for the benefit of all of its stockholders. *Id.* at *17. More technically, the duty of loyalty requires that the directors seek to maximize the value of the corporation for the ultimate benefit of "the undifferentiated equity as a collective, without regard to any special rights." *Id.*

[81] *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006) (cleaned up).

[82] *See United Food & Com. Workers Union v. Zuckerberg*, 250 A.3d 862, 895 (Del. Ch. 2020), *aff'd*, 262 A.3d 1034 (Del. 2021).

[83] *In re Walt Disney Co. Deriv. Litig.* (*Disney II*), 906 A.2d 27, 67 (Del. 2006) (quoting *Disney I*, 907 A.2d at 755); *accord Stone*, 911 A.2d at 369 ("A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation . . . ." (quoting *Disney II*, 906 A.2d at 67)); *see Gagliardi*, 683 A.2d at 1051 n.2 (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del. Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

[84] *Disney I*, 907 A.2d at 754.

director to [intentionally] place his own interests, preferences or appetites before the welfare of the corporation," including greed, "hatred, lust, envy, revenge, . . . shame or pride."[85] A director can therefore be liable for action in bad faith if "shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests."[86]

Significantly for this case, fiduciary duties under Delaware law run to the firm's stockholders as a whole in their capacities as stockholders "and not in any other capacities they may have."[87] Delaware decisions have consistently rejected claims by stockholder plaintiffs who have argued that directors breached their duties by taking action that harmed them in non-stockholder capacities.[88]

---

[85] *RJR Nabisco*, 1989 WL 7036, at *15; *see Guttman v. Huang*, 823 A.2d 492, 506 n.34 (Del. Ch. 2003) (Strine, V.C.) ("The reason for the disloyalty (the faithlessness) is irrelevant, the underlying motive (be it venal, familial, collegial, or nihilistic) for conscious action not in the corporation's best interest does not make it faithful, as opposed to faithless.").

[86] *RJR Nabisco*, 1989 WL 7036, at *15; *see Nagy v. Bistricer*, 770 A.2d 43, 48 n.2 (Del. Ch. 2000) ("[R]egardless of his motive, a director who consciously disregards his duties to the corporation and its stockholders may suffer a personal judgment for monetary damages for any harm he causes," even if for a reason "other than personal pecuniary interest.").

[87] *McRitchie v. Zuckerberg*, 315 A.3d 518, 539 (Del. Ch. 2024).

[88] *See id.* at 548–51 (collecting authorities).

*Nemec*[89] and *Riblet*[90] illustrate this principle. In *Nemec,* the board agreed to sell one of the corporation's two business units for approximately $700 per share. Before the transaction closed, the board caused the corporation to exercise its right to redeem shares held by retirees at their book value of $162.46 per share. The redemption increased the total amount of consideration available for other stockholders by $60 million. Two retirees sued, contending that the corporation breached the implied covenant of good faith and fair dealing by exercising the redemption right and that the directors breached the fiduciary duties they owed to the retirees as stockholders.

After rejecting the implied covenant claim, the Delaware Supreme Court held that the directors did not owe any fiduciary duties to the retirees for purposes of the redemption. The redemption right "was not one that attached to or devolved upon all the Company's common shares generally, irrespective of a contract."[91] For purposes of the redemption right, therefore, the retirees were not part of the stockholder collective; they were contractual counterparties, and the directors did not have any fiduciary duty to consider their interests in that capacity.[92]

---

[89] *Nemec*, 991 A.2d 1120.

[90] *Riblet Prods. Corp. v. Nagy*, 683 A.2d 37 (Del. 1996).

[91] *Nemec*, 991 A.2d at 1129.

[92] Under this line of reasoning, the justices could have held that the directors fulfilled their fiduciary duties by exercising the redemption right because it increased

The Delaware Supreme Court addressed a similar issue in *Riblet*.[93] There, three stockholders jointly controlled 85% of the common stock of a Delaware corporation. Ernest Nagy, the corporation's CEO, owned the remaining 15%. At the behest of the majority stockholders, the corporation terminated Nagy for cause. Nagy disputed his termination and sued for breach of his employment agreement. Nagy also contended that by terminating him, the majority stockholders breached the fiduciary duties they owed him as a minority stockholder. The Delaware Supreme Court held that Nagy could not assert a claim for breach of fiduciary duty based on his termination, because his contractual rights as an employee were "separate from his rights as a stockholder."[94] The Delaware Supreme Court acknowledged that the majority stockholders owed fiduciary duties to Nagy "as a minority stockholder," but nothing about his allegations implicated the directors' duties, which did not require considering Nagy's interests as an employee.[95]

*Nemec* and *Riblet* show that to act loyally, directors need not consider a stockholder's other capacities. "Directors can consider those other capacities if the directors subjectively believe doing so will enhance the value of the firm for its

---

the total pool of consideration available to the common stockholders in the aggregate. *See McRitchie*, 315 A.3d at 550 n.83.

[93] *Riblet Prods. Corp.*, 683 A.2d 37.

[94] *Id.* at 40.

[95] *Id.*

residual claimants, but those other capacities are not independently part of the fiduciary calculus."[96]

Applied to this case, the standard of conduct means that Morris, Einheiber, and Orleski had no duty to protect MacLaughlan's rights under the Oral Profits Agreement. To the extent MacLaughlan argues that Morris, Einheiber, and Orleski breached duties they owed *to him* by asserting the Diversion Claim and taking steps to investigate it, those actions affected MacLaughlan as a contractual counterparty. Directors do not owe fiduciary duties to contractual counterparties.

If anything, asserting the Diversion Claim and taking steps to investigate it fulfilled the standard of conduct. By pursuing the Diversion Claim, the directors sought to secure an asset—the 30% interest in the Orphan Drug's profits—for the Company's benefit, thereby enhancing the value of the Company. Under the standard of conduct, that theory does not state a claim on which relief can be granted.

## 2. Diversion Claim-Related Conduct And The Standard Of Review

The other version of the Complaint's theory about the Diversion Claim-related conduct fails because of the standard of review. When litigation arises, directors are not judged by the standard of conduct but rather using a standard of review.[97] "Delaware has three tiers of review for evaluating director decision-making: the

---

[96] *McRitchie*, 315 A.3d at 551.

[97] *Trados II*, 73 A.3d at 35–36.

business judgment rule, enhanced scrutiny, and entire fairness."[98] "In each manifestation, the standard of review is more forgiving of directors and more onerous for stockholder plaintiffs than the standard of conduct."[99] Here, the business judgment rule applies and leads to the dismissal of Count I.

The business judgment rule is Delaware's default standard of review. The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[100] Unless a plaintiff rebuts one of those elements, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives."[101] Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[102] The business judgment rule thus provides "something as close to

---

[98] *Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011). Delaware's intermediate standard of review—enhanced scrutiny—is not implicated by this case.

[99] *Chen*, 87 A.3d at 667.

[100] *Aronson*, 473 A.2d at 812.

[101] *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del. Ch. 2010).

[102] *See Brehm*, 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co., S'holders Litig.*, 542 A.2d 770, 780–81 (Del. Ch. 1988) (Allen, C.) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of

non-review as our law contemplates."[103] This standard of review "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation."[104]

Enhanced scrutiny is Delaware's intermediate standard of review.[105] Enhanced scrutiny applies to specific, recurring, and readily identifiable situations marked by two features. First, there is a distinct decision-making context where the realities of the situation can subtly undermine the decisions of even independent and disinterested fiduciaries.[106] Second, the decision under review involves the directors intruding into a space where stockholders possess rights of their own.[107] The

---

reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

[103] *Kallick v. Sandridge Energy, Inc.*, 68 A.3d 242, 257 (Del. Ch. 2013).

[104] *In re Trados Inc. S'holder Litig.* (*Trados I*), 2009 WL 2225958, at *6 (Del. Ch. July 24, 2009).

[105] *Firefighters' Pension Sys. of City of Kan. City, Mo. Tr. v. Presidio, Inc.*, 251 A.3d 212, 249 (Del. Ch. 2021).

[106] *Trados II*, 73 A.3d at 43.

[107] *See In re Columbia Pipeline Gp., Inc. Merger Litig.*, 299 A.3d 393, 458–59 (Del. Ch. 2023) (examining enhanced scrutiny precedents and demonstrating how they fit this pattern), *rev'd on other grounds*, 342 A.3d 324 (Del. 2025).

The second criterion—areas where stockholders have rights of their own— explains why enhanced scrutiny does not apply to CEO compensation decisions, even though the situational dynamics surrounding CEO compensation might otherwise raise sufficient concerns. *See* Jae Yoon, *Corporate Waste Crossing The Rubicon: The Case For Executive Compensation Award Enhanced Scrutiny Applied Review*, 7 Corp. & Bus. L.J. 149, 188–89 (2026) (arguing that CEO compensation presents a recurring scenario involving situational pressures that can undermine the decisions of even disinterested and independent directors); *see also* Lucian Bebchuk & Jesse Fried, *Pay*

directors' exercise of corporate power therefore raises questions about the allocation

of authority within the entity and, from a theoretical perspective, implicates the

principal-agent problem.[108] The resulting scenarios call for an intermediate standard

---

*Without Performance: The Unfulfilled Promise of Executive Compensation* 2, 37–39 (2004) (describing informational disparities that outside directors confront when making compensation decisions), *cited in Disney I*, 907 A.2d at 699 n.1; Lisa M. Fairfax, *Sue on Pay: Say on Pay's Impact on Directors' Fiduciary Duties*, 55 Ariz. L. Rev. 1, 17 (2013) (describing the dominant academic framework for understanding executive compensation, which recognizes that "directors are too often at an informational disadvantage when assessing and approving compensation packages," and "[a]s a result, they defer to executives or other corporation managers who may have more expertise and experience"); Michael B. Dorff, *Does One Hand Wash the Other? Testing the Managerial Power and Optimal Contracting Theories of Executive Compensation*, 30 J. Corp. L. 255, 261, 266–67 (2005) (describing the "Managerial Power Hypothesis" as including the claim that "directors who wish to question management, despite [other] contrary incentives, have limited resources with which to do so" and finding that the results of the article's analysis "strongly support the Managerial Power Hypothesis, that the existence of managerial power over directors erodes directors' ability to restrain managers from pursuing their own interests at the corporation's expense"); Lucian Arye Bebchuk, Jesse M. Fried & David I. Walker, *Managerial Power and Rent Extraction in the Design of Executive Compensation*, 69 U. Chi. L. Rev. 751, 766 (2002) (discussing problems that independent directors face when overseeing insiders' compensation and performance, including that "even if directors were otherwise inclined to challenge managers on the issue of executive compensation, they would likely have neither the financial incentive nor sufficient information to do so"); *id.* at 772 ("[E]ven if directors have the inclination and incentive to negotiate for CEO compensation that maximizes shareholder value, they will usually lack the information to do so effectively. The CEO, by way of his personnel department, controls much of the information that reaches the committee.").

[108] To be clear, directors and officers are not agents of the stockholders, nor are the stockholders their principals. "A board of directors, in fulfilling its fiduciary duty, controls the corporation, not *vice versa*. It would be an analytical anomaly, therefore, to treat corporate directors as *agents* of the corporation when they are acting as *fiduciaries* of the stockholders in managing the business and affairs of the corporation." *Arnold v. Soc'y for Sav. Bancorp., Inc.*, 678 A.2d 533, 540 (Del. 1996) (footnote omitted); *see also Presidio*, 251 A.3d at 286 ("Rather than treating directors as agents of the stockholders, Delaware law has long treated directors as analogous

of review that examines "the reasonableness of the end that the directors chose to pursue, the path that they took to get there, and the fit between the means and the end."[109]

Delaware's most onerous standard of review is the entire fairness test. When entire fairness governs, the defendants must establish "to the *court's* satisfaction that the transaction was the product of both fair dealing *and* fair price."[110] "Not even an honest belief that the transaction was entirely fair will be sufficient to establish entire fairness."[111] "Rather, the transaction itself must be objectively fair, independent of the board's beliefs."[112]

If a claim does not identify any of the recurring scenarios that could implicate enhanced scrutiny, then the business judgment rule presumptively applies. At the pleading stage, to change the standard of review from the business judgment rule to entire fairness, the complaint must allege facts supporting a reasonable inference that the directors who approved the challenged action did not include independent and disinterested directors, acting carefully and in good faith, with enough voting

---

to trustees for the stockholders."). The principal-agent problem uses the language of economic theory, not the language of legal relationships.

[109] *Obeid v. Hogan*, 2016 WL 3356851, at *13 (Del. Ch. June 10, 2016).

[110] *Cinerama, Inc. v. Technicolor, Inc.*, (*Technicolor Plenary*), 663 A.2d 1156, 1163 (Del. 1995) (internal quotation marks omitted).

[111] *Gesoff v. IIC Indus., Inc.*, 902 A.2d 1130, 1145 (Del. Ch. 2006).

[112] *Id.*

power by themselves to deliver a majority.[113] Consequently, to determine whether to intensify the standard of review from business judgment to entire fairness, a court conducts a director-by-director analysis.[114] If that analysis reduces the uncompromised director vote count below a majority, then the standard of review elevates to entire fairness.

To plead that a director was interested and therefore cannot count toward the requisite majority, a plaintiff can allege facts showing that the director received "a personal financial benefit from a transaction that is not equally shared by the

---

[113] *See Aronson*, 473 A.2d at 812 (noting that if "the transaction is not approved by a majority consisting of the disinterested directors, then the business judgment rule has no application"). The voting power formulation is necessary because the Delaware General Corporation Law authorizes a charter to grant some directors greater voting rights. 8 *Del. C.* § 141(d); *see Marchand v. Barnhill*, 212 A.3d 805, 815 (Del. 2019) (evaluating demand futility where one director exercised multiple votes). Independent and disinterested directors who acted with due care and in good faith may therefore deliver a majority of the director voting power, even if they do not constitute a majority of the humans on the board.

Under this standard, if the votes are evenly divided between compromised and uncompromised directors, then the plaintiff has succeeded in rebutting the business judgment rule. *See Gentile v. Rossette*, 2010 WL 2171613, at *7 n.36 (Del. Ch. May 28, 2010) ("A board that is evenly divided between conflicted and non-conflicted members is not considered independent and disinterested."); *see also Beam v. Stewart*, 845 A.2d 1040, 1046 n.8 (Del. 2004) (noting for demand futility purposes that a board evenly divided between interested and disinterested directors could not exercise business judgment on a demand); *Beneville v. York*, 769 A.2d 80, 85 (Del. Ch. 2000).

[114] *See Cede*, 634 A.2d at 361, 364 (requiring director-by-director analysis); *Disney II*, 906 A.2d at 52 (affirming director-by-director analysis).

stockholders."[115] Or a plaintiff can allege facts showing that the director was a dual fiduciary and owed a competing duty of loyalty to an entity that itself stood on the other side of the transaction or received a unique benefit not shared with the stockholders.[116] To plead that a director lacked independence and therefore cannot count toward the requisite board majority, a plaintiff can plead facts showing a director is sufficiently loyal to, beholden to, or otherwise influenced by an interested party to undermine the director's ability to judge the matter on its merits.[117]

---

[115] *Rales*, 634 A.2d at 936; *accord Cede*, 634 A.2d at 362 ("Classic examples of director self-interest in a business transaction involve either a director appearing on both sides of a transaction or a director receiving a personal benefit from a transaction not received by the shareholders generally."); *Pogostin*, 480 A.2d at 624 ("Directorial interest exists whenever . . . a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the stockholders."). "[A] subjective 'actual person' standard [is used] to determine whether a 'given' director was likely to be affected in the same or similar circumstances." *McMullin v. Beran*, 765 A.2d 910, 923 (Del. 2000) (quoting *Technicolor Plenary*, 663 A.2d at 1167). "[T]he benefit received by the director and not shared with stockholders must be 'of a sufficiently material importance, in the context of the director's economic circumstances, as to have made it improbable that the director could perform her fiduciary duties . . . without being influenced by her overriding personal interest.'" *Trados I*, 2009 WL 2225958, at *6 (quoting *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999)).

[116] *See Weinberger v. UOP, Inc.*, 457 A.2d 701, 710–11 (Del. 1983) (holding that officers of parent corporation faced conflict of interest when acting as subsidiary directors regarding transaction with parent); *accord Sealy Mattress Co. of N.J., Inc. v. Sealy, Inc.*, 532 A.2d 1324, 1336–38 (Del. Ch. 1987) (same); *see also Trados I*, 2009 WL 2225958, at *8 (treating directors as interested for pleading purposes in transaction that benefited preferred stockholders when "each had an ownership or employment relationship with an entity that owned Trados preferred stock").

[117] *Aronson*, 473 A.2d at 815 (stating that one way to allege successfully that an individual director is under the control of another is by pleading "such facts as would demonstrate that through personal or other relationships the directors are beholden to the controlling person"); *Friedman v. Beningson*, 1995 WL 716762, at *4

47

A plaintiff also may challenge a director's decision by alleging facts that call into question whether the director acted in good faith. Delaware law "clearly permits a judicial assessment of director good faith" for the purpose of rebutting the business judgment rule.[118]

---

(Del. Ch. Dec. 4, 1995) (Allen, C.) ("The requirement that directors exercise *independent judgment, (insofar as it is a distinct prerequisite to business judgment review from a requirement that directors exercise financially disinterested judgment*), directs a court to an inquiry into all of the circumstances that are alleged to have inappropriately affected the exercise of board power. This inquiry may include the subject whether some or all directors are 'beholden' to or under the control, domination or strong influence of a party with a material financial interest in the transaction under attack, which interest is adverse to that of the corporation."). Classic examples involve familial relationships, such as a parent's love for and loyalty to a child. *See, e.g.*, *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) ("That Hudson also happens to be Huizenga's brother-in-law makes me incredulous about Hudson's impartiality. Close familial relationships between directors can create a reasonable doubt as to impartiality. The plaintiff bears no burden to plead facts demonstrating that directors who are closely related have no history of discord or enmity that renders the natural inference of mutual loyalty and affection unreasonable." (footnote omitted)); *Chaffin v. GNI Gp. Inc.*, 1999 WL 721569, at *5 (Del. Ch. Sep. 3, 1999) (holding father-son relationship was sufficient to rebut presumption of independence) ("Inherent in the parental relationship is the parent's natural desire to help his or her child succeed . . . . [M]ost parents would find it highly difficult, if not impossible, to maintain a completely neutral, disinterested position on an issue, where his or her own child would benefit substantially if the parent decides the issue a certain way."); *see also London v. Tyrrell*, 2010 WL 877528, at *14 n.60 (Del. Ch. Mar. 11, 2010) ("[I]n the pre-suit demand context, plaintiffs can often meet their burden of establishing a lack of independence with a simple allegation of a familial relationship. Surely then . . . it will be nigh unto impossible for a corporation bearing the burden of proof to demonstrate that an SLC member is independent in the face of plaintiffs' allegation that the SLC member and a director defendant have a family relationship.").

[118] *Disney II*, 906 A.2d at 53; *accord eBay*, 16 A.3d at 40.

The Complaint's allegations about Diversion Claim-related conduct do not implicate enhanced scrutiny, so the business judgment rule presumptively applies. The Complaint's allegations about Diversion Claim-related conduct fail to rebut any of the business judgment rule's presumptions and therefore do not trigger entire fairness. Because the business judgment rule governs, the Diversion Claim-related aspects of Count I are dismissed.

### a. Einheiber

MacLaughlan seeks to rebut the business judgment rule for purposes of decisions relating to the Diversion Claim by asserting that Einheiber is a conflicted dual fiduciary. MacLaughlan also argues that the Diversion Claim is so meritless that Einheiber is inferably pursuing the claim in bad faith.

The dual fiduciary theory fails because there is no conflict between Einheiber's dual roles. Einheiber is the CFO of Parent. In that capacity, Einheiber owes fiduciary duties to Parent. In the landmark *Weinberger* decision, the Delaware Supreme Court held that there is "no dilution" of the duty of loyalty when a director "holds dual or multiple" fiduciary roles.[119] "If the interests of the beneficiaries to whom the dual fiduciary owes duties are aligned, then there is no conflict."[120] But if the interests of

---

[119] 457 A.2d at 710.

[120] *Trados II*, 73 A.3d at 46–47; *see Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *11 (Del. Ch. Mar. 7, 1991).

the beneficiaries diverge, the fiduciary faces an inherent conflict of interest. "There is no 'safe harbor' for such divided loyalties in Delaware."[121]

The Complaint alleges that because of her dual roles, Einheiber faces a conflict between doing what is best for the Company and doing what is best for Parent. But the Complaint's allegations fail to support a reasonable inference of misalignment. The Diversion Claim seeks to recover an asset for the Company. Parent is a stockholder of the Company. Parent does not have any competing interest in the Company. Parent is not on the other side of the Diversion Claim. Parent does not stand to receive a non-ratable benefit from the Diversion Claim.

To create a conflict of interest, the Complaint alleges that Einheiber asserted the Diversion Claim in bad faith to coerce MacLaughlan into agreeing to redeem Parent's shares for $4.5 million. That allegation does not support a reasonably conceivable inference of bad faith. Einheiber and Orleski already comprise a majority of the Board. They do not need MacLaughlan's support to cause the Company to take action. Nor would it make sense to trade the Diversion Claim for a redemption. The Diversion Claim is inferably worth around $16.8 million (30% of $56 million). In light of its stock ownership, Parent is indirectly entitled to approximately 32.57% of that value, or around $5.5 million. Morris allegedly wants the Preferred Stock redeemed for $4.5 million. Why would Parent give up $5.5 million—plus its share of the Orphan

---

[121] *Weinberger*, 457 A.2d at 710.

Drug profits going forward and its liquidation preference—to get $4.5 million? MacLaughlan offers no answer.

MacLaughlan suggests that Einheiber is inferably acting in bad faith and wasting the Company's assets because the Diversion Claim is wholly baseless.[122] He argues that under the Governance Agreement, the Company could not have "enter[ed] new lines of business"[123]—such as developing the Orphan Drug—without Board approval. He also alleges that the Diversion Claim is time-barred. He maintains that because the Diversion Claim is baseless, incurring expenses to pursue it can only harm the Company.

The Complaint's allegations, however, do not suggest that the Diversion Claim is baseless. They suggest that the Diversion Claim is fairly litigable, although MacLaughlan may have valid defenses. The factual and legal bona fides of the "Morris-approved-it" defense are contestable. The statute of limitations defense is not

---

[122] MacLaughlan approaches bad faith and waste as different things. "Although waste historically was viewed as a type of ultra vires act that was beyond a fiduciary's power to take, contemporary Delaware authorities have integrated the concept into the business judgment rule as a means of pleading bad faith." *IBEW Loc. Union 481 Defined Contribution Plan & Tr. v. Winborne*, 301 A.3d 596, 622 (Del. Ch. 2023); *see In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 693–94 (Del. Ch. 2023) (collecting cases). "Pleading that a transaction is so extreme as to suggest waste is thus one way to plead bad faith, but not the only way." *Winborne*, 301 A.3d at 622. "While every act of waste supports an inference of bad faith, every act committed in bad faith does not necessarily constitute waste." *Frederick Hsu Living Tr.*, 2017 WL 1437308, at *42. This decision refers to bad faith with the understanding that it encompasses the concept of waste.

[123] Ex. B § 3.

so obvious that investigating the Diversion Claim is inferably wasteful. The Complaint does not support an inference that asserting the Diversion Claim is so extreme an act as to constitute bad faith.

### b. Orleski

As with Einheiber, MacLaughlan seeks to rebut the business judgment rule for purposes of conduct relating to the Diversion Claim by asserting that Orleski is a conflicted dual fiduciary. MacLaughlan again suggests that the Diversion Claim is so meritless that Orleski is inferably pursuing the claim in bad faith. Those theories again fail.

The dual-fiduciary theory falls short again for want of a conflicted beneficiary. Orleski serves as Vice President and General Counsel of Pharmascience. The Complaint alleges that Morris controls Parent, and Parent in turn controls Pharmascience. The Complaint contends that Orleski therefore faces a conflict between doing what is best for the Company and doing what is best for Pharmascience and Parent. But for the same reason that Parent does not have a conflict for purposes of Einheiber, Parent does not have a conflict for purposes of Orleski.

The Complaint also does not support an inference that Orleski acted in bad faith or committed waste by pursuing the Diversion Claim. The analysis is the same as for Einheiber.

### 3. Diversion Claim-Related Conduct And Morris

The Complaint alleges that Morris acted disloyally by engaging in conduct related to the Diversion Claim, but the Complaint is not terribly clear about what he did as a director as opposed to as a controlling stockholder. Reading the Complaint broadly, there does not appear to be a viable claim against Morris in his capacity as a director.

The only act that Morris seems to have taken in his capacity as a director was coming up with the plan to pursue the Diversion Claim. MacLaughlan claims that Morris acted disloyally because he envisioned using the Diversion Claim to bully MacLaughlan into redeeming Parent's Preferred Stock. That is a variant of the attack on Einheiber and Orleski, and it fails for the same reasons.

The attack on Morris for coming up with the plan to pursue the Diversion Claim also fails because it would implicate a corporate version of thought-crime. Coming up with a plan is not actionable. A director must do something, either by taking action or engaging in conscious inaction.[124]

---

[124] For breaches of fiduciary duty, Delaware law equates the two. *See, e.g.*, *Aronson*, 473 A.2d at 813 ("[A] conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."); *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) ("The Complaint alleges that the Board had the ability to defer interest payments on the Junior Notes, that the Junior Notes would not receive anything in an orderly liquidation, that [Defendant] owned all of the Junior Notes, and that the Board decided not to defer paying interest on the Junior Notes to benefit [Defendant]. . . . A decision to act and a conscious decision not to act are . . . equally subject to review under traditional fiduciary duty principles."); *Hubbard v. Hollywood Park Realty Enters., Inc.*, 1991 WL 3151, at *10 (Del. Ch. Jan. 14, 1991) ("[T]he case-by-case development of the law governing fiduciary obligations . . . cannot be constrained

The Complaint also alleges that Morris abdicated his duties as a director until he became interested in using the Diversion Claim to force a buyout of Parent's shares. The Complaint offers no details in support of the abdication theory. It is wholly conclusory and fails on that basis.

Rather than identifying acts Morris took as a director, the Complaint targets actions he took as a stockholder. He caused Parent to make a request for books and records. He later caused Parent to remove himself and his colleague as directors and replace them with Einheiber and Orleski. And after leaving the Board, he caused Parent's CEO to tell Jonathan not to talk to MacLaughlan, torpedoing the Company's efforts to renew the Orphan Drug Agreement.

Morris did not engage in those activities as a director. Except for causing Parent to serve a books and records demand, he took those actions after leaving the Board. The Complaint does not support an inference that Morris breached his fiduciary duties as a director.

## C. The Claim Based On The Dissolution Resolution

MacLaughlan also asserts that the directors breached their fiduciary duties by failing to abide by the Dissolution Resolution. The Complaint does not support a reasonable inference that Orleski and Einheiber face a conflict of interest regarding dissolution. The Complaint also does not support an inference that proposing to

---

by so facile a distinction. From a semantic and even legal viewpoint, 'inaction' and 'action' may be substantive equivalents, different only in form.").

condition dissolution on the results of the Committee's investigation is so extreme an act as to support an inference of bad faith.

MacLaughlan contends that Orleski and Einheiber have refused to comply with the Dissolution Resolution or otherwise vote to dissolve the Company because they want to use the Diversion Claim as leverage against him. This is the same theory that underlies MacLaughlan's allegations about the Diversion Claim-related conduct itself, and it fails for the same reasons.

MacLaughlan also suggests that by failing to comply with the Dissolution Resolution, Orleski and Einheiber acted in bad faith by intending to violate applicable positive law or by failing to act in the face of a known duty to act.[125] There are three paths for triggering dissolution under Delaware law. The first involves a board resolution passed "by a majority of the whole board" followed by a stockholder vote by a majority of the outstanding voting power.[126] The second involves unanimous stockholder approval.[127] The third applies to a corporation with a limited lifespan.[128] If one of those paths is followed, then a certificate of dissolution must be filed.[129]

---

[125] *See Disney II*, 906 A.2d at 67.

[126] *See* 8 *Del. C.* § 275(a) & (b).

[127] *Id.* § 275(c).

[128] *Id.* § 275(f).

[129] *Id.* § 275(b), (c) & (f).

A board of directors that failed to comply with the mandatory requirement to file a certificate of dissolution conceivably could breach its duty of loyalty by failing to act in good faith. A complaint that sufficiently alleges bad faith at the pleading stage rebuts the business judgment rule and states a claim on which relief can be granted.[130] The Complaint does not allege facts supporting a conceivable inference that any of the prerequisites for mandatory dissolution were followed. It appears undisputed that they were not.

MacLaughlan's theories related to dissolution in particular and the Dissolution Resolution in general do not support a claim on which relief can be granted.

## D.    Counts I and III Are Dismissed.

Counts I and III both rest on the same allegations about the same underlying conduct. Those allegations fail to support a claim that any of the directors breached their fiduciary duties. Both Counts I and III are therefore dismissed.

## IV.    MORRIS'S RULE 12(B)(2) MOTION

Having disposed of the claims against Morris as a director, this decision can now return to Morris's motion for dismissal under Rule 12(b)(2). The Complaint asserts claims against Morris in four capacities: as a director, controlling stockholder, conspirator, and tortious interferer. Morris contends that this court cannot exercise personal jurisdiction over him other than as a director. The answer depends on

---

[130] *Disney II*, 906 A.2d at 52 (explaining that business judgment rule's presumptions "can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith").

whether the Complaint states a viable claim against him in his capacity as a director. Because it does not, the court cannot assert personal jurisdiction over him in his non-director capacities.

Recall that MacLaughlan relies on the Director Consent Statute to assert personal jurisdiction over Morris. Under that statute, Morris's service as a director both provides a basis for the assertion of personal jurisdiction and satisfies due process for claims relating to his service as a director.[131]

For the Director Consent Statute to supply jurisdiction for claims against Morris in a non-director capacity, the Complaint must state a viable claim against Morris as a director, and the claims against Morris in his non-director capacity must relate to the claim over which jurisdiction exists. "[O]nce a valid claim has been brought and personal jurisdiction established over a party defending a proper claim, . . . Delaware courts are justified in asserting personal jurisdiction over the defending party where the subject matter of the claim is sufficiently related to the plaintiff's independent claims."[132] "Delaware public policy favors Delaware courts assuming

---

[131] *See Armstrong v. Pomerance*, 423 A.2d 174, 175–76 (Del. 1980); *HMG/Courtland Props., Inc. v. Gray*, 729 A.2d 300, 306 (Del. Ch. 1999).

[132] *Fitzgerald v. Chandler*, 1999 WL 1022065, at *4 (Del. Ch. Oct. 14, 1999) (internal quotation marks omitted); *see SPay, Inc. v. Stack Media Inc.*, 2021 WL 6053869, at *4–5 (Del. Ch. Dec. 21, 2021) (exercising jurisdiction because "claims are sufficiently related for personal jurisdiction purposes"); *Canadian Com. Workers Indus. Pension Plan v. Alden*, 2006 WL 456786, at *11–12 (Del. Ch. Feb. 22, 2006) (exercising jurisdiction where claims "depend on a number of the same facts"). *See generally Harris*, 289 A.3d at 297–98.

personal jurisdiction over parties in order to adjudicate claims which sufficiently relate to other claims which do properly bring the party within those courts' jurisdiction."[133]

Without a viable claim that properly supplies a basis for this court to assert jurisdiction, however, ancillary jurisdiction does not exist. Put differently, a party cannot assert a non-meritorious claim against a director and rely on the Director Consent Statute to supply jurisdiction over meritorious claims.

The Complaint fails to state a meritorious claim against Morris as a director. The court therefore cannot exercise jurisdiction over Morris for purposes of the claims against him as a controlling stockholder, conspirator, or tortious interferer. Those claims are dismissed for lack of jurisdiction over Morris in those capacities.

## V. THE CONSPIRACY CLAIM

Count IV asserts that if any of the defendants were not themselves fiduciaries when they acted, then they conspired with any of the defendants who were fiduciaries to commit a fiduciary breach. Orleski and Einheiber were fiduciaries, not conspirators, and the Complaint does not plead a fiduciary breach. The court can only exercise jurisdiction over Morris as a director. The court cannot adjudicate claims against him as a conspirator. The court similarly cannot exercise jurisdiction over Parent for purposes of a conspiracy claim. Count IV is therefore dismissed.

---

[133] *Fitzgerald*, 1999 WL 1022065, at *4; *accord SPay*, 2021 WL 6053869, at *5.

## VI. THE TORTIOUS INTERFERENCE CLAIM

Count V asserts that Morris and Parent tortiously interfered with the Company's rights under the Orphan Drug Agreement. The court cannot exercise personal jurisdiction over Morris or Parent for purposes of that claim. It is dismissed.

## VII. THE DECLARATORY JUDGMENT

The foregoing analysis leaves only Count II, which seeks a declaratory judgment that MacLaughlan possesses a right to 30% of the profits from the Orphan Drug under the Oral Profits Agreement. That count states a claim on which relief can be granted.

The defendants' only argument for dismissing Count II contends that the Complaint names the wrong parties. To issue a declaratory judgment, there must be an actual controversy meeting the following prerequisites:

> (1) It must be a controversy involving the rights or other legal relations of the party seeking declaratory relief; (2) it must be a controversy in which the claim of right or other legal interest is asserted against one who has an interest in contesting the claim; (3) the controversy must be between parties whose interests are real and adverse; [and] (4) the issue involved in the controversy must be ripe for judicial determination.[134]

The defendants contend that none of them have any interest in the net sales of the Orphan Drug under either the Orphan Drug Agreement or the Oral Profits

---

[134] *Gannett Co. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1237 (Del. 2003) (internal quotation marks omitted).

Agreement, and hence the claim has not been asserted "against one who has an interest in contesting that claim."[135]

That argument initially sounds good as to the individual defendants and Parent, because none of them claim to be parties to the Orphan Drug Agreement or the Oral Profits Agreement. But it does not work for the Company, which at a minimum is a party to the Orphan Drug Agreement and receives all of the sales revenue for the Orphan Drug in the first instance. The defendants point out that the Complaint currently names the Company only as a nominal defendant, but the Company has joined in the defendants' motions as if it were an active litigant.

The defendants also contend that none of them have made any claim to net sales under the Orphan Drug Agreement. That also is technically true, but Morris, Einheiber, and Orleski have all taken the position that the Company—rather than MacLaughlan—has the right to receive the 30% of the Orphan Drug's profits not destined for Knight. They thus have asserted the Diversion Claim, albeit on the Company's behalf.

The Company has an obvious interest in contesting MacLaughlan's claim. So do the individual defendants and Parent, all of whom have asserted the Diversion Claim.

The defendants also argue that MacLaughlan must sue Knight to adjudicate his rights under the Orphan Drug Agreement. That does not follow. The Orphan Drug

---

[135] *Id.* (internal quotation marks omitted).

Agreement is between the Company and Knight. It calls for Knight to receive a payment equal to the greater of Knight's actual cost of goods plus 10% or "seventy percent (70%) of Net Sales less allowances for Non-Conforming Product or expired Product."[136] The Orphan Drug Agreement does not govern what happens to the amounts the Company generates under that agreement. Any rights that MacLaughlan has under the Oral Profits Agreement are between MacLaughlan and the Company, not between MacLaughlan and Knight. Knight is not a necessary party.

Count II is dismissed as to the individual defendants and Parent. Count II can proceed against the Company—not as a nominal defendant but as an actual defendant. The court could dismiss the Complaint in its entirety with leave for MacLaughlan to file a new action against the Company, but that course of action has little to commend it other than generating another filing fee for the court.[137]

## VIII. CONCLUSION

Parent's motion to dismiss under Rule 12(b)(2) is granted. Morris's motion to dismiss under Rule 12(b)(2) is granted as to all claims against him in his capacities as a controlling stockholder, conspirator, or tortious interferer. Count IV is dismissed without prejudice. Counts I, III, and V are dismissed without prejudice to the extent

---

[136] Ex. D § 5.2.

[137] *Nagy*, 770 A.2d at 58 ("I fail to see any basis in law for exacting an additional filing fee from Nagy when no fathomable justification exists for requiring the filing of a new pleading with a separate civil action number.").

they assert claims against Parent or Morris in his capacities as a controlling stockholder, conspirator, or tortious interferer. Counts I, III, and V are dismissed with prejudice to the extent they assert claims against Orleski or Einheiber or against Morris in his capacity as a director. The case will proceed only as to Count II. Because of the significant changes in the nature and scope of this action, MacLaughlan must file a second amended complaint within thirty days that names the Company as a merits defendant.